# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 22, 2011      Decided December 23, 2011

No. 10-1103

PSEG ENERGY RESOURCES & TRADE LLC AND PSEG POWER
CONNECTICUT LLC,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ISO NEW ENGLAND INC., ET AL.,
INTERVENORS

———

On Petition for Review of Orders of
the Federal Energy Regulatory Commission

———

*John Lee Shepherd, Jr.* argued the cause for petitioner. With him on the briefs were *Kenneth R. Carretta* and *Sally Brown Richardson*.

*Jennifer S. Amerkhail*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief was *Robert H. Solomon*, Solicitor.

*Kerim P. May* and *Sherry A. Quirk* were on the brief for intervenor ISO New England Inc.

*John S. Wright* and *Michael C. Wertheimer*, Assistant Attorneys General, Office of the Attorney General for the State of Connecticut, and *Joseph A. Rosenthal* and *Randall L. Speck* were on the brief for intervenors George C. Jepsen, Attorney General, et al.

Before: GARLAND and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: In this petition for review, PSEG Energy Resources & Trade LLC and PSEG Power Connecticut LLC (collectively, PSEG) challenge orders of the Federal Energy Regulatory Commission (FERC) accepting the results of an auction for electric generation capacity conducted by ISO New England Inc. In those orders, FERC approved ISO New England's determination that, unlike other resources in the region, PSEG's resources in Connecticut could not reduce their capacity supply obligation because doing so would endanger the system's reliability. Importantly, it also held that ISO New England could reduce the per unit price paid to PSEG for that capacity. Because the latter holding was based on tariff provisions that the Commission thought were clear but now concedes are ambiguous, and because in the course of construing those provisions it failed to respond to PSEG's facially legitimate objections, we grant the petition and remand the orders for further consideration.

I

PSEG is one of many generators that participate in New England's "forward capacity market." In this market, electricity providers purchase from generators options to buy quantities of

energy three years in advance. *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 130 S. Ct. 693, 697 (2010). In setting prices, the market eschews the traditional regulatory approach, which sets utility rates based on the cost of production, in favor of an auction. Managing the auction is the responsibility of ISO New England, which is a "'private, non-profit entity [that] administer[s] New England energy markets and operate[s] the region's bulk power transmission system.'" *Blumenthal v. FERC*, 552 F.3d 875, 878 (D.C. Cir. 2009) (quoting *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 796 (D.C. Cir. 2007)). ISO New England's tariff implements the market's auction mechanism, which originated in a FERC-approved settlement among more than 100 stakeholders. *See Blumenthal*, 552 F.3d at 879; *ISO New England Inc.*, 119 FERC ¶ 61,045, 61,162 (2007).

Under the settlement and tariff, a descending auction sets the price that capacity suppliers like PSEG receive. The basic mechanism is straightforward. After the auctioneer, ISO New England, announces a starting price, suppliers respond with bids for how much capacity they are willing to provide at that price. The auctioneer gradually reduces the price, and suppliers reduce their capacity bids accordingly. The auction ends when the suppliers' bids just equal the amount of capacity that ISO New England has determined to be necessary to maintain the reliability of the regional system. This amount is known as the "installed capacity requirement," or ICR. Each supplier is then committed to provide capacity equal to its bid. *See Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 480 (D.C. Cir. 2009).

But the forward capacity market has a twist: a price floor that halts the auction if the floor is reached. The problem is that the auction may reach the price floor at a point where the suppliers' capacity bids still exceed the ICR; hence, absent

correction, purchasers would end up buying too much power. The capacity market's solution is proration. The basic idea is that each supplier has its capacity obligation, and the payment it receives, reduced proportionally. The Proration Rule of ISO New England's tariff implements this solution in a somewhat roundabout way. *See* Tariff § III.13.2.7.3(b) (J.A. 178); *infra* note 1. Although the rule's full complexity need not detain us, the key mechanism is as follows: the rule calculates the "total payment cap" by multiplying the floor price by the ICR, then proportionately reduces the amount each supplier receives so that the total does not exceed the cap ("price proration"), and then gives each supplier the option to reduce its capacity obligation an equivalent amount ("quantity proration"). For example, if the ICR were 50 units, and two suppliers each bid 30 units at a floor price of $1, the total payment cap would be $50. Each supplier would receive a proportionate amount of $25 (price proration), and each could then reduce its capacity obligation to 25 units (quantity proration).

In 2007, without specific comment, FERC approved ISO New England's addition of the following caveat as a new last sentence of the Proration Rule: "Any proration shall be subject to reliability review." Tariff § III.13.2.7.3(b); *see ISO New England Inc.*, 122 FERC ¶ 61,016, 61,049 (2008); *see also ISO New England Inc.*, FERC No. ER07-1388, Various Revisions to FCM Rules, attach. 1 at 1st Rev. Sheet No. 7314Q (Aug. 31, 2007) (J.A. 239). This case is about the meaning of that caveat. In ISO New England's view, it means that when it determines that a supplier's resources are needed for local reliability, it can bar quantity proration but force the supplier to accept price proration. Thus, the supplier is effectively required to accept a per unit price lower than the floor price. In the example above, this would require a supplier to provide the full 30 units but still accept only $25, an effective price of $0.83 per unit rather than $1.00. PSEG -- whose attempt to prorate the capacity of its

Connecticut resources was barred as a consequence of the reliability review for the 2008 New England auction -- believes that it should receive the full (unprorated) floor price for all its resources that it could not prorate. In the example above that would be $30, which PSEG says cashes out to an extra $2.8 million in this case.[1]

---

[1]The full Proration Rule, with the reliability caveat italicized, states as follows:

> The Capacity Clearing Price shall not fall below 0.6 times CONE [Cost of New Entry]. Where the Capacity Clearing Price reaches 0.6 times CONE, offers shall be prorated such that no more than the Installed Capacity Requirement is procured in the Forward Capacity Auction, as follows: the total payment to all listed capacity resources during the associated Capacity Commitment Period shall be equal to 0.6 times CONE times the Installed Capacity Requirement applicable in the Forward Capacity Auction. Payments to individual listed resources shall be prorated based on the total number of MWs [megawatts] of capacity clearing in the Forward Capacity Auction (receiving a Capacity Supply Obligation for the associated Capacity Commitment Period). Suppliers may instead prorate their bid MWs of participation in the Forward Capacity Market by partially de-listing one or more resources (e.g., proration may be done by reducing, through bilateral contracts, the capacity of one resource by the amount equal to the entire prorated amount of the Market Participant). Regardless of any such proration, the full amount of capacity that cleared in the Forward Capacity Auction will be ineligible for treatment as new capacity in subsequent Forward Capacity Auctions (except as provided under Section III.13.1.1.1.2). *Any proration shall be subject to reliability review.*

Tariff § III.13.2.7.3(b) (J.A. 178) (emphasis added).

PSEG filed its objections with FERC, which must review and approve ISO New England's auction results under the settlement and § 205 of the Federal Power Act (FPA), 16 U.S.C. § 824d(d). *See Devon Power LLC*, 115 FERC ¶ 61,340, 62,309 (2006). After FERC sided with ISO New England, *see ISO New England Inc.*, 123 FERC ¶ 61,290, 62,925 (2008) [hereinafter Initial Order], PSEG sought rehearing. In its rehearing request, PSEG contended that FERC's interpretation, in addition to violating the tariff's express terms, resulted in "undue discrimination" against the resources most necessary for reliability, by paying them less per unit than resources that were permitted to prorate quantity. PSEG also argued that FERC's interpretation contradicted what PSEG contended were the forward capacity market's "basic policy goals": to provide incentives for existing resources to remain in, and for new resources to be constructed in, areas subject to resource constraints. Request for Rehearing at 3, 9-11 (July 21, 2008) (J.A. 104, 110-12).

On rehearing, FERC again rejected PSEG's interpretation. *ISO New England Inc.*, 130 FERC ¶ 61,235 (2010) [hereinafter Rehearing Order]. FERC held that when reliability review precludes quantity proration, the tariff still requires ISO New England to impose price proration to avoid violating the total payment cap, which it regarded as sacrosanct. Rehearing Order, 130 FERC at 62,147. FERC did note, however, that ISO New England and its stakeholders "have made a filing with the Commission that may result in revised market rules on this issue." *Id.* And so it did: less than a month later, FERC approved a revision to the Proration Rule that adopted PSEG's position -- for prospective application only. FERC "agree[d] that this proposed solution is an improvement and addresses an inconsistency between the compensation provided to resources that are denied the ability to prorate megawatts at the price floor and other cleared capacity." *ISO New England Inc.*, 131 FERC

¶ 61,065, 61,345 (2010). Meanwhile, PSEG petitioned for review of FERC's orders, which had denied PSEG's request for relief in the instant case.

II

Under § 313(b) of the FPA, 16 U.S.C. § 825*l*(b), we have jurisdiction to review FERC's orders, which we assess to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see TNA Merchant Projects, Inc. v. FERC*, 616 F.3d 588, 591 (D.C. Cir. 2010).  To survive this review, FERC "must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Among other things, "[a]n agency's 'failure to respond meaningfully' to objections raised by a party renders its decision arbitrary and capricious."  *Id.* (quoting *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001)).

In reviewing FERC's tariff interpretation, we use "a two-step, *Chevron*-like analysis."  *Colorado Interstate Gas Co. v. FERC*, 599 F.3d 698, 701 (D.C. Cir. 2010) (citing *Old Dominion Elec. Coop., Inc. v. FERC*, 518 F.3d 43, 48 (D.C. Cir. 2008)).  At step 1, "[w]e first 'consider *de novo* whether the [tariff] unambiguously addresses the matter at issue.  If so, the language . . . controls for we must give effect to the unambiguously expressed intent of the parties.'" *Id.* (quoting *Ameren Servs. Co. v. FERC*, 330 F.3d 494, 498 (D.C. Cir. 2003)).  At step 2, "'[i]f the tariff language is ambiguous, we defer to the Commission's construction of the provision at issue

so long as that construction is reasonable.'" *Id.* (quoting *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814-15 (D.C. Cir. 1998)). *See generally Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

According to FERC's Rehearing Order, the last sentence of the Proration Rule, "[a]ny proration shall be subject to reliability review," allows ISO New England to bar resources from reducing their capacity obligation, yet still requires them to accept a prorated price. The Commission stated its view that the total payment cap provision of the Proration Order is inviolate, even during reliability review, and that paying resources that were precluded from prorating quantity at the unprorated floor price could violate that cap. Rehearing Order, 130 FERC at 62,147. PSEG raises a host of arguments challenging this interpretation. But it also argues (1) that FERC wrongly read the tariff's text as *compelling* the conclusion FERC reached, and (2) that FERC wrongly failed to respond to its discrimination and policy arguments. Because we agree with these latter two points, we need not address PSEG's other arguments.

1. In rejecting PSEG's arguments, FERC spoke the language of textual clarity. In its Initial Order, FERC explained that "the [forward capacity market] rules are clear" that resources prevented from prorating quantity must still receive a prorated price. Initial Order, 123 FERC at 62,925. And on rehearing, FERC declared that "the current tariff language does not allow" PSEG's interpretation. Rehearing Order, 130 FERC at 62,147.

On appeal, however, FERC's counsel conceded that the relevant provision of the Proration Rule is ambiguous. FERC Br. 28 ("The final sentence of the Proration Rule . . . is ambiguous."); Oral Arg. Tr. 24 (acknowledgment by FERC counsel that the provision is ambiguous); *cf.* ISO New England

Br. 14 ("It is necessary to acknowledge that the rule language at issue here contains some ambiguity."). We agree. As FERC's brief acknowledges, the rule's final sentence "does not explain how ISO New England will conduct its review or what the ISO's next step will be if it determines that reliability is in peril." FERC Br. 28. In particular, the rule does not unambiguously proclaim FERC's position that the total payment cap is sacrosanct even during reliability review, as compared to PSEG's view that "[a]ny proration shall be subject to reliability review" means there should not be "any" proration -- whether of quantity or of price -- for any resources that are required to preserve system reliability.

When a text is ambiguous under *Chevron* step 1, we normally proceed to determine whether the agency's interpretation is reasonable under *Chevron* step 2. But when "an agency erroneously contends that Congress' intent has been clearly expressed and has rested on that ground, we remand to require the agency to consider the question afresh in light of the ambiguity we see." *Cajun Elec. Power Coop., Inc. v. FERC*, 924 F.2d 1132, 1136 (D.C. Cir. 1991). We do so because, under step 2, we examine whether the agency has reasonably exercised its discretion. But when the agency's decision "was not based on [its] own judgment but rather on the unjustified assumption that it was Congress' judgment that such [an outcome is] desirable or required," the agency has not exercised that discretion at all. *Transitional Hospitals Corp. of La., Inc. v. Shalala*, 222 F.3d 1019, 1029 (D.C. Cir. 2000) (internal quotation marks omitted). The same analysis applies to FERC's interpretation of a tariff. Because "discretion must be exercised through the eyes of one who realizes she possesses it," *id.*, we must remand to permit the Commission to determine "whether [it] wishes to retain [its interpretation] knowing that other options are permissible," *id.* at 1021.

Indeed, this is a particularly appropriate case for remand. Although FERC denied PSEG the relief it sought, it subsequently described the petitioners' position as "an improvement" that "addresses an inconsistency," and it revised the tariff language to make it applicable in future situations. 131 FERC at 61,345. A remand will permit the Commission to determine whether, knowing that it has more discretion than it thought it had, PSEG's position would be an appropriate way to interpret the unrevised language as well.

2. There is a second problem with FERC's orders. "'[U]nless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned.'" *PPL Wallingford*, 419 F.3d at 1198 (quoting *Canadian Ass'n*, 254 F.3d at 299). This applies as strongly to agency interpretations under *Chevron* step 2 as to other agency actions. *TNA*, 616 F.3d at 593; *see NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998).

PSEG raised two such objections below. First, PSEG argued that FERC's interpretation would result in "undue discrimination" because "some resources will involuntarily be paid less than other resources" on a per unit basis. Rehearing Request at 9-10 (J.A. 110-11). "[M]oreover, the resources receiving the lower unit payments are located in the regions where the megawatts make the largest contribution to system reliability." *Id*. at 10 (J.A. 111).[2] Second, PSEG contended that

---

[2]Before the Commission, it was not clear whether PSEG's "undue discrimination" argument was a reference to § 205 of the FPA, which prohibits public utilities from (inter alia) "subject[ing] any person to any undue prejudice or disadvantage" or "maintain[ing] any unreasonable difference in rates," 16 U.S.C. § 824d(b), or whether it was simply an appeal to policy or fairness as a guide in reading the

FERC's interpretation was "inconsistent with the fundamental policy goals" of the forward capacity market. *Id.* In PSEG's view, those goals were "to provide incentives for existing resources to remain in constrained areas and for new entry resources to be constructed in those areas." The goals were undermined, PSEG maintained, by an interpretation that barred such resources from receiving the floor price when they were not permitted to prorate quantity. *Id.* at 11 (J.A. 112).

As these are "objections that on their face seem legitimate," the Commission was required to answer them. *PPL Wallingford*, 419 F.3d at 1198. Yet, it did not do so. It is true, as FERC's counsel pointed out, that the Commission noted the objections and -- without more -- characterized them as "more broadly" supporting PSEG's position. Rehearing Order, 130 FERC at 62,146. To characterize objections, however, is not to answer them.

Counsel for FERC also contended that the Commission effectively responded to these objections by referencing two other proceedings that, in counsel's view, were where "the discrimination and equity claims . . . more properly [should have been] raised." FERC Br. 32-33. The first was the 2007 proceeding in which FERC had accepted the addition of the "reliability review" language; the second was the parallel stakeholder process for changing the market rules prospectively. Although we doubt that either of those proceedings could have rendered PSEG's instant filing untimely or an impermissible collateral attack,[3] the important point is that the Commission

tariff. Either way, as we discuss in the following text, FERC erred in failing to respond to it.

[3]As to the 2007 proceeding, when an agency interprets an existing rule in a new way (or for the first time), a challenge constitutes an

itself -- as distinguished from its appellate counsel -- never suggested that they did. "We, of course, 'cannot accept appellate counsel's post hoc rationalizations for agency action.'" *TNA*, 616 F.3d at 593 (quoting *Fed. Power Comm'n v. Texaco, Inc.*, 417 U.S. 380, 397 (1974)). Rather, "an agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.'" *Id.* (quoting *Texaco*, 417 U.S. at 397).

The same problem bars our reliance on another argument of appellate counsel. In FERC's brief, counsel called our attention to a footnote in the Rehearing Order, which states that the purpose of the Proration Rule's price floor is to "'ensure relative market stability during the initial years of the Forward Capacity Market.'" FERC Br. 31 (quoting Rehearing Order, 130 FERC at 62,147 n.40). But once again, the order does nothing more than make the quoted statement; it does not suggest that -- let alone explain how -- it was a response to PSEG's undue discrimination or policy arguments. On remand, FERC must respond to both.

---

impermissible collateral attack "only if a reasonable firm . . . would have perceived a very substantial risk that the [provision] meant what [the agency] now says it meant." *Dynergy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122, 1126 (D.C. Cir. 2011) (internal quotation marks omitted). Given the Proration Rule's conceded ambiguity, it is unlikely that PSEG's challenge meets this standard. As to the stakeholder proceeding, it was concerned only with prospective revision, an outcome that could not remedy the $2.8 million loss that PSEG alleges was caused by the orders under review.

13

III

For the foregoing reasons, the petition for review is granted, and FERC's orders are remanded for further proceedings consistent with this opinion.

*So ordered.*