**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FALL RIVER RURAL ELECTRIC
COOPERATIVE, INC.,
                    *Petitioner,*

          v.                              No. 06-71944

FEDERAL ENERGY REGULATORY                 OPINION
COMMISSION,
                    *Respondent.*

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

Argued and Submitted
March 11, 2008—San Francisco, California

Filed September 10, 2008

Before: Stephen Reinhardt, Melvin Brunetti, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Brunetti

**COUNSEL**

Peter C. Kissel and Paige Bullard, Law Offices of GKRSE, Washington, D.C.; Ray W. Rigby and Jerry R. Rigby, Rigby, Thatcher, Andrus, Rigby & Moeller, Rexburg, Idaho, for the petitioner.

Samuel Soopper and Beth G. Pacella, Federal Energy Regulatory Commission, Washington, D.C., for the respondent.

**OPINION**

BRUNETTI, Circuit Judge:

Fall River Rural Electric Cooperative, Inc. (Fall River) petitions for review of two Federal Energy Regulatory Commission (FERC) orders. Fall River applied for a license to construct, operate, and maintain a new hydroelectric power generating facility at Hebgen Dam on the Madison River in Gallatin County, Montana. In its orders FERC dismissed Fall River's license application and denied Fall River's request to hold the proceeding in abeyance, *Fall River Rural Elec. Coop., Inc.*, 111 ¶ FERC 62,333 (2005), and it denied Fall River's request for rehearing, *Fall River Rural Elec. Coop., Inc.*, 114 FERC ¶ 61,152 (2006). Fall River timely petitioned for review of both orders. We have jurisdiction pursuant to 16 U.S.C. § 825*l*(b), and we deny Fall River's petition for review.

## I.  Facts and Proceedings Below

The Missouri-Madison Hydroelectric Project develops hydropower on a 324-mile stretch of the Madison and

Missouri Rivers in southwestern Montana. The project is licensed to Pennsylvania Power and Light Montana, LLC (PPL) under FERC Project No. 2188. *PP&L Montana, LLC*, 92 FERC ¶ 61,261 (2000). The project consists of nine hydro-electric developments, eight of which have power generating facilities. *Id.* at 61,830. The Hebgen Development is the one development without a power generating facility and is instead used as a water storage and release facility. Releases from Hebgen Reservoir provide head and flow to the Missouri-Madison Hydroelectric Project's eight other down-stream developments. *Id.*

Hebgen Dam is an earth-filled structure with a concrete core wall and is 721 feet long and 85 feet high. Discharges from Hebgen Reservoir are controlled by outlet works con-sisting of an intake tower, a conduit through the dam, and a conduit outlet. The intake tower includes four openings, two of which are presently closed with timber stoplogs, while the other two are used for reservoir discharges. Water passes from the intake tower through the dam structure in a woodstave-lined conduit, which has an unreinforced concrete encasement and is approximately 785 feet long and twelve feet in diame-ter. The conduit outlet is an irregularly-shaped concrete box structure at the toe of the dam that directs discharges into the Madison River. The Hebgen Development also includes a spillway, which is located on the right abutment of the dam.

In 2001, FERC granted Fall River a three-year preliminary permit to conduct investigations and to secure data necessary to determine the feasibility of a hydroelectric development project at Hebgen Dam. *Symbiotics, LLC*, 95 FERC ¶ 62,265, 64,400 (2001).[1] PPL did not oppose Fall River's preliminary permit application and in fact cooperated with Fall River's feasibility studies and engaged in negotiations with Fall River regarding a possible site use and operations agreement.

---

[1] FERC subsequently replaced all references to Symbiotics, LLC with "Fall River Rural Electric Cooperative, Inc."

12636 FALL RIVER RURAL ELECTRIC v. FERC

In May 2004, Fall River filed its Final License Application for the proposed Hebgen Dam Hydroelectric Project No. 11882. In its application, Fall River proposed several modifications and additions to the existing Hebgen Development. First, Fall River proposed constructing a powerhouse with a single turbine generator unit eighty feet downstream from the toe of the dam and immediately north of the present conduit outlet. Discharges would be made through a submerged concrete-lined draft tube below the surface of the tailwater. Second, Fall River proposed pressure-grouting and steel-lining the conduit because it was not designed to withstand the full reservoir pressure required for power generation. Third, Fall River proposed bifurcating the conduit approximately 50 to 60 feet upstream of the current conduit outlet. Fall River proposed installing a steel penstock ten feet in diameter to direct the flow from the existing conduit to the proposed powerhouse. The bifurcation and isolation valves would be located in a new concrete valve house upstream of the proposed powerhouse. Fifth, a new power transmission line would be installed to connect the plant electrical output to Fall River's existing Hebgen substation near Grayling, Montana. Sixth, and finally, Fall River proposed using all four of the existing intake tower's openings by removing the timber stoplogs from the two currently unused openings and installing intake gates in their place.

While Fall River's license application did not propose modifying the existing spillway, PPL would have to use the spillway for all discharges during approximately three months of the construction period. Once completed, the powerhouse would operate in "run-of-river mode," and would utilize flow releases from Hebgen Dam as determined under PPL's license. Fall River would not have access to reservoir storage for additional power generation.

In July 2004, FERC informed Fall River by letter that its license application potentially conflicted with Section 6 of the

Federal Power Act (FPA), 16 U.S.C. § 799.[2] Specifically, FERC stated that it "cannot, without [PPL's] concurrence, approve a development proposal that would materially affect or modify the licensed project. Without PPL's consent to [Fall River's] proposed modifications to Project No. 2188, [Fall River's] application would be precluded by the requirements of FPA Section 6 and therefore would be subject to rejection under 18 C.F.R. § 4.32 (e) (2)."[3] However, because Fall River was in the process of negotiating a site use and operations agreement with PPL, FERC stated that it would "continue to process [Fall River's] application, conditioned on [Fall River] filing . . . additional information showing that PPL has not ruled out an agreement to the modifications to its Project No. 2188." FERC required Fall River to provide this information within thirty days and by the end of each subsequent sixty-day period. Fall River did so, filing five status reports between August 2004 and May 2005.

Just before Fall River filed its last status report, however, PPL sent a letter to Fall River terminating negotiations. The letter stated that "the negotiations with [Fall River] over an extended period have not been successful" and that PPL was "not interested in proceeding any further with negotiations." PPL also filed a copy of the letter with FERC.

---

[2]Section 799 provides in pertinent part: "Licenses may be revoked only for the reasons and in the manner prescribed under the provisions of this chapter, and may be altered or surrendered only upon mutual agreement between the licensee and the Commission after thirty days' public notice." 16 U.S.C. § 799.

[3]Section 4.32(e)(2) provides in pertinent part:

> If, within 90 days of its filing date, the Director of the Office of Energy Projects determines that an application patently fails to substantially comply with the requirements of paragraph (a), (b), and (c) of this section and of § 4.38 of this part or § 16.8 of this chapter, or is for a project that is precluded by law, the application will be rejected as patently deficient with the specification of the deficiencies that render the application patently deficient.

18 C.F.R. § 4.32(e)(2).

In its final status report, after noting PPL's letter and recognizing that "it appear[ed] that negotiations ha[d] come to a stalemate," Fall River declared its "intent to continue it's [sic] efforts to resolve there [sic] difference's [sic] with PPL in the hopes of coming to an acceptable financial arrangement." Fall River further noted that "prior to PPL's letter of January 17, 2005 there ha[d] been no objection by PPL for the licensing and development of additional generation at the Hebgen Dam," and therefore requested that FERC "continue to move forward with the licensing of the Hebgen Dam project." Alternatively, if FERC "fe[lt] it [was] unable to proceed with the licensing" in the absence of PPL's consent, Fall River requested that FERC "hold the licensing process in abeyance until such time that Fall River and PPL have resolved there [sic] differences."

PPL then sent a letter to FERC to "supplement and clarify" certain issues in Fall River's status report. PPL stated: "[O]n April 29, 2005, PPL Montana notified Falls River [sic] that it was terminating negotiations for a site agreement. As PPL Montana has already communicated to Falls River [sic] and NPSI, we do not intend to resume these negotiations for the installation of additional generation at the Hebgen Development by Falls River [sic] or NPSI."[4]

Shortly thereafter, the Director of FERC's Division of Hydropower Licensing dismissed Fall River's license application and denied its request to hold the application in abeyance. *Fall River Rural Elec. Coop., Inc.*, 111 FERC ¶ 62,333 (2005) (the Dismissal Order). The Director concluded that Fall River's proposed project is barred under FPA Section 6 because it "would substantially alter PPL Montana's licensed project works" without PPL's consent. *Id.* at 64,733. The Director specifically noted Fall River's proposals to modify

---

[4]"NPSI" refers to Northwest Power Services, Inc., which Fall River designated as its project liaison for correspondence. Accordingly, most if not all of Fall River's correspondence in the record is by or to NPSI.

the "existing intake structure by inserting new gates and screens in two presently-closed intake openings," to bifurcate the outlet conduit, to install a penstock extending to a new powerhouse, and that "installation of its valve house to bifurcate the Hebgen outlet conduit . . . will require extensive excavation of the earth fill covering the conduit." *Id.* The Director concluded, "[t]hese are the types of modifications to a licensed project that the Commission has found require the licensee's consent under Section 6 of the FPA." *Id.* Therefore, "[w]ithout PPL Montana's consent for these alterations, the application must be dismissed . . . without prejudice to Fall River re-filing its application, in the event it is able to obtain PPL Montana's consent for use of the Hebgen Development." *Id.* The Director further concluded that because of PPL's intention not to resume negotiations, "[n]o public purpose would be served by continuing to process the application or to hold the application in abeyance." *Id.*

Fall River then filed a request for rehearing, which a panel of three commissioners denied. *Fall River Elec. Coop., Inc.*, 114 FERC ¶ 61,152 (2006) (the Rehearing Order). The panel concluded that "[t]he proposed project requires alterations of the existing project's facilities that are much greater than the kind of physical alterations the Commission has previously found to be insubstantial." *Id.* at 61,509. In reaching this conclusion, the panel specifically noted the "installation of new gates and screens on the intake tower, excavation of a large area of the dam in order to reconfigure and reline the outlet conduit, and installation of a valve house and new penstock at the dam," and the fact that "[c]onstruction of the proposed project would also require PPL to enter into an agreement with Fall River regarding coordination of activities, and responsibility for operation and maintenance of joint use facilities." *Id.* Therefore, the panel concluded, "the physical changes to the existing structures are not minor" and that such coordination obligations are not "insubstantial." *Id.*

After explaining that "a substantial alteration may result . . . from significant alterations to project works" alone, *id.* at

61,509, the panel also concluded that "the potential for . . . joint-use operational problems would be a substantial alteration of the existing license," *id.* at 61,510, thereby requiring PPL's consent. The panel specifically noted that: (1) "PPL's ability to meet its flow requirements . . . could be compromised" during the three months of construction when all flows would be released via the spillway; (2) after construction, PPL's ability to maintain appropriate dissolved oxygen levels could be compromised because under Fall River's proposal, water would be released below the tailwater surface rather than dropping into the tailwater as it currently does; and (3) "it might be necessary to require finer screening at the intakes" to guard against turbine entrainment mortality of salmonid, thereby "potentially compromis[ing] PPL's ability to satisfy the flow release requirements of its license." *Id.* at 61,509.

The panel also concluded that FERC's prior issuance of a preliminary permit was not inconsistent with its dismissal of Fall River's license application, in light of the limited purpose of the preliminary permit and the intervening breakdown in negotiations between PPL and Fall River. *Id.* at 61,510. Finally, the panel rejected Fall River's arguments that PPL either expressly consented to future modifications of its license by accepting Standard Articles 9 and 10 in its Missouri-Madison license, or had "impliedly consented" by expressing no opposition to Fall River's preliminary permit application or its final license application, or by cooperating with Fall River for years before abruptly terminating negotiations. *Id.* at 61,510-11.

Fall River timely petitioned for review of both the Dismissal Order and the Rehearing Order.

## II.   Standards of Review

Under the Administrative Procedure Act, this court reviews decisions by FERC to determine whether the agency action

was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2); *Cal. Dep't of Water Res. v. FERC*, 489 F.3d 1029, 1035 (9th Cir. 2007). Under the FPA, FERC's factual findings are conclusive if supported by substantial evidence. 16 U.S.C. § 825*l*(b); *Bear Lake Watch, Inc., v. FERC*, 324 F.3d 1071, 1076 (9th Cir. 2003). "Here, as elsewhere, [s]ubstantial evidence constitutes more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. If the evidence is susceptible of more than one rational interpretation, we must uphold [FERC's] findings." *Id.* (internal quotation marks and citation omitted; alterations in original). FERC's interpretation of the FPA is entitled to *Chevron* deference. *Am. Rivers v. FERC*, 201 F.3d 1186, 1194 (9th Cir. 2000).

## III.   Discussion

### A.   Substantial Evidence of an "Alteration" Under Section 6 of the FPA

Fall River first argues that because its proposal would not substantially or materially alter PPL's project's configuration, mode of operations, or power generation, FERC's orders are not supported by substantial evidence. We disagree.

**[1]** Section 6 of the FPA states that licenses "may be altered . . . only upon mutual agreement between the licensee and the Commission . . . ." 16 U.S.C. § 799. The term "altered" is not statutorily defined; however, both parties agree that in order to violate Section 6, a proposed project must *substantially* alter an existing license. As neither party disputes the relevant standard, for purposes of this appeal we assume without deciding that in order for Section 6 of the FPA to apply, a proposed project must substantially alter an existing license. *Cf. Pac. Gas & Elec. Co. v. FERC*, 720 F.2d 78, 90 n.36 (D.C. Cir. 1983) ("We do not, however, adopt FERC's view that only 'substantial alterations' in a license engage

section 6 protections . . . .”). Under this standard, FERC may authorize “de minimis interferences with the operation of an existing plant”—*i.e.*, “[s]mall encroachments on a license, comparable in their adverse impact to variations in conditions that investors might expect from other causes such as, for example, annual fluctuations in water supply.” *Id.* at 90. FERC may not, however, issue a license which “will significantly interfere with operations already licensed, whether the interference will adversely affect the prior licensee’s physical plant, its ‘project works,’ or its supplies of water.” *Id.* at 89 n.31.

Under FERC precedent, “[w]hat constitutes an ‘alteration’ for Section 6 purposes is primarily a factual issue to be determined in each case.” *Universal Elec. Power Co.*, 92 FERC ¶ 61,242, 61,768 (2000). Therefore, FERC’s conclusion that Fall River’s proposed project would substantially alter PPL’s license is “conclusive” if supported by substantial evidence. 16 U.S.C. § 825*l*(b).

In this case, FERC concluded that both Fall River’s proposed physical modifications to the Hebgen Development and the possible operational impacts to the Missouri-Madison project constitute “substantial alterations” of PPL’s license. 114 FERC ¶ 61,152, at 61,509; *see Gas & Elec. Dep’t of Holyoke*, 21 FERC ¶ 61,357, 61,927 (1982) (“[T]here are essentially two types of interference with the licensed project that we must consider: (1) physical alterations to existing project works; and (2) impacts on the operation of the project.”).

FERC first explained in its Rehearing Order that the “proposed project requires alterations of the existing project’s facilities that are much greater than the kind of physical alterations the Commission has previously found to be insubstantial.” 114 FERC ¶ 61,152, at 61,509. In reaching this conclusion FERC specifically relied on “the installation of new gates and screens on the intake tower, excavation of a large area of the dam in order to reconfigure and reline the

outlet conduit, and installation of a valve house and a new penstock at the dam." *Id.*

Fall River first objects to FERC's finding that its proposal includes installing screens on the intake tower. Though screens were mentioned on multiple occasions in the documents supporting Fall River's license application, Fall River is correct that screens were not part of its final license application. Nevertheless, Fall River does not dispute that it proposes making physical alterations to the intake tower, namely removing the timber stoplogs from the two presently-closed intake openings and installing two new intake gates in their place.

Fall River next notes that excavation would be limited to a relatively small area on the downstream toe of the dam, and would not amount to the "excavation of a large area of the dam" described by FERC. Fall River asserts that the excavation would be limited to the hillside over the downstream sixty feet of the conduit. There is no dispute, however, that the proposed excavation requires removing approximately 3,100 square feet of soil for construction of the new power-house and valve house. Fall River simply prefers to character-ize this as excavating a "relatively small area" rather than a "large area."

Next, while conceding that it proposes relining the conduit, Fall River objects to FERC's finding that the outlet conduit will be "reconfigured." However, the license application explicitly proposes bifurcating the outlet conduit, installing a new penstock, and constructing a new concrete valve house, in addition to pressure-grouting and steel-lining the conduit.

After discussing the aforementioned physical alterations, FERC also concluded that in this case the potential for "joint-use operational problems would be a substantial alteration of the existing license." 114 FERC ¶ 61,152, at 61,509-10. Spe-cifically, FERC identified: (1) use of the spillway for all dis-

charges during approximately three months of the construction period as potentially impacting PPL's ability to meet its flow requirements; (2) releasing water below the tail-water's surface rather than allowing the water to drop into the tailwater as potentially affecting PPL's ability to maintain appropriate dissolved oxygen levels; and (3) the possibility of having to install finer screening at the intakes as potentially impacting PPL's ability to meet its flow requirements. *Id.*

Fall River contends that FERC's conclusion with respect to PPL's operations is purely speculative and has no basis in evidence. Again, we disagree. It is undisputed that Fall River's license application proposes closing the intake gates and conduit during approximately three months of the construction period, with all discharges being made via the spillway during this time. It is also undisputed that Fall River proposes discharging water below the tailwater's surface rather than allowing the flow to drop into the tailwater, as it currently does. Finally, in its "official response" to Fall River's draft license application, Montana Fish, Wildlife and Parks recommended that Fall River incorporate the following language into its license: "If future monitoring results indicate that significant entrainment is occurring and that screening is a necessary and effective option for reducing entrainment, then *screening the intake may be required at some future date*." (Emphasis added.)

**[2]** Choosing to focus on the impact of each of these proposed modifications individually, Fall River apparently does not appreciate the cumulative impact of its proposed project. Fall River proposes doubling the number of intake openings used and installing new gates on the intake tower, thereby increasing pressure within the conduit. Fall River proposes steel-lining and pressure-grouting the conduit because it "was not designed to withstand the full reservoir pressure which would be required for power generation." Rather than using the existing conduit outlet, Fall River proposes bifurcating the conduit and installing a new penstock. Rather than having dis-

charges drop into the tailwater below the conduit outlet as they currently do, Fall River proposes releasing water below the tailwater's surface. During approximately three months of construction, Fall River proposes making all discharges via the spillway, which is not ordinarily used for discharges and has no backup, as it is the backup. Collectively, these alterations fundamentally change the physical characteristics and operation of the Hebgen Development. Admittedly, FERC cannot know whether certain operational problems will arise, but neither can Fall River ensure that they will not. However, FERC's ability to accurately predict the future is rather beside the point. Here, there is much more than a "mere scintilla" of evidence supporting FERC's conclusion that Fall River's proposal would substantially alter PPL's license; therefore, it is supported by substantial evidence. In sum, we conclude that each of FERC's factual findings with respect to Fall River's proposed physical alterations and operational interferences with PPL's license are supported by substantial evidence, and that FERC's conclusion that Fall River's proposal would substantially alter PPL's existing license is also supported by substantial evidence.

## B.   FERC Precedent

Fall River next argues that FERC's orders are inconsistent with its precedents and are therefore not entitled to deference. In its Rehearing Order FERC analyzed Fall River's proposed project by applying both cases involving a substantial alteration of an existing license, and cases where it found no substantial alteration. 114 FERC ¶ 61,152, at 61,508-09. Fall River challenges FERC's application of these cases.

### 1.   Cases Finding a Substantial Alteration

[3] In *Niagra Mohawk Power Corporation*, FERC rejected a license application that proposed a two-phase modification of an existing development. 29 FERC ¶ 61,005, 61,010 (1984). The first phase involved modifying an existing head-

gate structure, rehabilitating an existing portion of an abut-
ment, and constructing a powerhouse and penstocks. *Id.* The
second phase involved preventing all flows from entering the
existing plant, effectively closing down its operation. *Id.*
FERC concluded that "this amount of construction work
requires fundamental alterations to [the] licensed project
works, and places it in clear violation of Section 6." *Id.* Fall
River contends that its proposed modifications to the Hebgen
Development are not remotely similar in scale to the proposed
alterations in *Niagra Mohawk*. However, as in *Niagra
Mohawk*, Fall River's proposal includes more than an insub-
stantial amount of construction, namely building a power-
house, installing a penstock, and excavating around a portion
of PPL's existing conduit.

In *JDJ Energy Company*, FERC rejected a preliminary
license application that proposed modifying approximately 75
feet of an existing dam and modifying an existing powerhouse
to accommodate construction of a new powerhouse. 41 FERC
¶ 61,354 (1987). FERC explained that "JDJ's proposal would
involve significant structural modifications to the project dam
and to project works in the area immediately adjacent to the
dam." *Id.* Fall River notes that it does not propose any modifi-
cations to an existing powerhouse and "very little" modifica-
tions to the existing dam. However, Fall River does propose
constructing a powerhouse, modifying the intake tower and
conduit, and installing a penstock.

In *Green Island Power Authority*, FERC rejected a prelimi-
nary license application that proposed constructing a new dam
that would inundate an existing dam, decommissioning vari-
ous other facilities, thereby rendering an existing project inop-
erable. 110 FERC ¶ 61,034, 61,109 (2005). Fall River notes
that its proposed project bears no similarity to the project pro-
posed in *Green Island*. Admittedly, Fall River's proposal
would not render PPL's project inoperable, but that does not
necessarily make FERC's orders in this case inconsistent with
*Green Island*. FERC never represented Fall River's proposal

to be on all fours with the proposed project in *Green Island*. FERC's citation to *Green Island* simply illustrates an extreme example of a substantial alteration.

## 2.   Cases Finding No Substantial Alteration

In *Weber Basin Water Conservancy District*, FERC granted a license that proposed installing a penstock underneath an existing canal. 50 FERC ¶ 61,409, 62,263 (1990). Construction of the penstock involved making an opencut excavation through the canal, approximately eight feet wide and eight feet deep, placing the penstock in the excavation, backfilling the excavation, and restoring the disturbance to the canal lining. *Id.* n.13. In concluding that these proposed modifications did not amount to a substantial alteration, FERC explained that "once constructed [the penstock] will not physically interfere with [prior licensees]," and that "construction should take approximately three to seven days to complete." *Id.* As noted, and unlike in *Weber Basin*, Fall River's penstock would physically interfere with PPL's license because it would fundamentally alter the flow of water through Hebgen Dam. Furthermore, Fall River's proposed construction schedule spans an estimated eight months, not three to seven days.

In *Howard W. Bair*, FERC granted a preliminary permit that proposed utilizing an existing fish water release pipe and constructing a powerhouse. 20 FERC ¶ 61,092, 61,194 (1982). The only proposed modification to the existing iron pipe was to extend it by forty feet, *id.* at App. A, which FERC noted was only a "small scale development." By contrast, Fall River's proposed modifications to the intake tower and conduit are far more extensive than simply extending the existing conduit by forty feet. Further, *Bair* involved an application for a preliminary permit, not a final license. FERC will issue a preliminary permit unless "*it is clear* at the preliminary permit stage" that the license would require an existing licensee's permission under Section 6. *See Kamargo Corp.*, 53 FERC ¶ 61,411, 62,439 (1990) (emphasis added).

Finally, in both *PG&E*, 720 F.2d at 89, and *Fluid Energy Systems, Inc.*, 24 FERC ¶ 61,298, 61,615 (1983), FERC concluded that a 0.3% reduction in power generation did not amount to a substantial alteration of an existing license. Fall River notes that similar to these cases, its proposed project will not reduce power generation at the Hebgen Dam. This is undoubtedly true, as the Hebgen Development currently has no power generating facilities. However, neither *PG&E* nor *Fluid Energy Systems* involved physical modifications to an existing project comparable to those now proposed by Fall River.

**[4]** In sum, we disagree with Fall River's argument that FERC's orders are inconsistent with its precedents. In citing these cases, FERC did not suggest they are on all fours factually with Fall River's proposed project. Instead, FERC used these cases as examples of instances where alterations were substantial and where they were not. As FERC explained in its Rehearing Order, "[t]he degree of encroachment that makes an alteration 'substantial' is a case-specific determination." 114 FERC ¶ 61,152, at 61,508. These cases served as guideposts in FERC's evaluation and analysis of Fall River's proposal. Therefore, FERC's conclusion in this case that Fall River's proposed project amounts to a substantial alteration of PPL's license under Section 6 of the FPA is entirely consistent with its precedents and is entitled to deference.

## C. Preliminary Permit

Fall River next argues that FERC's orders are inconsistent with its regulations and with its issuance of a preliminary permit in this case because Fall River's Preliminary Permit Application was substantially identical to its Final License Application. Fall River contends that this change in policy must be supported by a reasoned explanation. *See generally Flagstaff Med. Ctr., Inc. v. Sullivan*, 962 F.2d 879, 886 (9th Cir. 1992) (explaining that "changes in agency interpretation must be supported by a 'reasoned analysis' ").

**[5]** FERC's preliminary permit regulations provide: "The Commission will not accept an application for a preliminary permit for project works that . . . [w]ould interfere with a licensed project in a manner that, absent the licensee's consent, would be precluded by Section 6 of the Federal Power Act." 18 C.F.R. § 4.33(a)(2). FERC's practice is that "where it is clear at the preliminary permit application stage that the development proposed in the permit application would cause impermissible alterations of an existing license under section 6, the Commission will not grant the permit." *Kamargo Corp.*, 53 FERC ¶ 61,411, at 62,439. However, "[w]here it is not clear at the permit stage that the proposed development would involve an impermissible alteration of an existing license, the Commission will issue the permit." *Id.* In other words, "[t]he preliminary permit is actually only a minor threshold hurdle for the applicant, and the grant of a preliminary permit is in no respect an indication of the merits of a license proposal." *Town of Summersville v. FERC*, 780 F.2d 1034, 1038-39 (D.C. Cir. 1986). Therefore, "[u]nless a permanent legal barrier precludes FERC from licensing the project, FERC will issue a preliminary permit." *Id.* at 1038.

**[6]** We cannot say that it was "clear" at the preliminary permit stage that Fall River's proposed project would substantially alter PPL's license, nor can we say that there was a "permanent legal barrier" to Fall River's proposed project when FERC issued the preliminary permit. In fact, Fall River discussed developing Hebgen Dam with PPL in early 2001, and at that time PPL agreed that Fall River could and would make an application for a preliminary permit, and that it would negotiate a site use agreement with Fall River.

**[7]** In granting Fall River's preliminary permit, FERC noted Fall River's representation "that they will not impact [PPL's] project." 95 FERC ¶ 62,265, at 64,400. Had Fall River and PPL reached a mutually acceptable site use agreement, there is no indication that Fall River's preliminary permit application would have otherwise been precluded by a

"permanent legal barrier." When PPL ultimately informed FERC that it "[did] not intend to resume these negotiations for the installation of additional generation at the Hebgen development," FERC promptly dismissed Fall River's license application. Therefore, we conclude that FERC's orders are consistent with both its regulations on issuing preliminary permits and its prior issuance of a preliminary permit in this case, and that FERC has not made any change in policy that requires justification.

## D.  Consent

Fall River's final argument is that FERC failed to adequately consider whether PPL impliedly consented to Fall River's proposed project by not intervening in, protesting, or commenting on either the Preliminary Permit Application or the Final License Application.

In its Rehearing Order, FERC noted Fall River's argument that "PPL has impliedly consented by expressing no opposition to Fall River's preliminary permit or filing no comments in response to its license application proposal." 114 FERC ¶ 61,152, at 61,510-11. FERC did not, however, include a separate analysis addressing this argument.

**[8]** Nevertheless, Fall River does not cite a single case requiring FERC's orders to thoroughly analyze each and every argument in order to engage in reasoned decision making, nor have we found one. We would not expect FERC to have spent much time addressing Fall River's implied consent argument in this case, as Section 6 of the FPA unequivocally provides that a license "may be altered . . . only upon mutual agreement between the licensee and the Commission." Fall River cites no authority indicating that this agreement may be implied rather than express, and our research has uncovered only cases where FERC had an express agreement with the prior licensees. *See, e.g., PG&E*, 720 F.2d at 91-92 (explaining that FERC expressly retained broad authority to permit

future development under existing license). We harbor no doubt that FERC recognized Fall River's implied consent argument and rejected it.

Finally, because Fall River did not argue its express consent argument specifically and distinctly in its opening brief we deem it waived. *See Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1208 n.3 (9th Cir. 2008).

## IV.   Conclusion

In sum, we conclude that substantial evidence supported FERC's conclusion that PPL's license would be substantially altered under Section 6 of the FPA by Fall River's proposed project, that FERC's orders were consistent with its precedents and with its issuance of a preliminary permit, and that PPL did not impliedly consent to Fall River's proposed modifications. Therefore, Fall River's petition for review is **DENIED**.