**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TURLOCK IRRIGATION DISTRICT; MODESTO IRRIGATION DISTRICT, *Petitioners*, | No. 16-71380 |
| | FERC No. EL15-55-001 |
| TRANSMISSION AGENCY OF NORTHERN CALIFORNIA; THE M-S-R PUBLIC POWER AGENCY; THE CITY OF REDDING, CALIFORNIA; SACRAMENTO MUNICIPAL UTILITY DISTRICT, *Intervenors*, | OPINION |
| v. | |
| FEDERAL ENERGY REGULATORY COMMISSION, *Respondent*, | |
| PACIFIC GAS AND ELECTRIC COMPANY; CALIFORNIA DEPARTMENT OF WATER RESOURCES, *Intervenors*. | |

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

Argued and Submitted May 14, 2018
San Francisco, California

Filed September 6, 2018

Before:  Sidney R. Thomas, Chief Judge, Michelle T.
Friedland, Circuit Judge, and Thomas S. Zilly,* District
Judge.

Opinion by Chief Judge Thomas

---

**SUMMARY**\**

**Federal Energy Regulatory Commission**

The panel granted a petition for review brought by the
Turlock and Modesto Irrigation Districts, and held that the
Federal Energy Regulatory Commission ("FERC")'s orders
denying the Districts' complaint and denying rehearing were
arbitrary and capricious.

To supply power to their service areas, the Districts use
transmission and generation facilities both within and
outside of their individual electric systems.  In order to
import and export power into and out of their systems, the
Districts use the California-Oregon Transmission Project,

---

\* The Honorable Thomas S. Zilly, Senior District Judge for the U.S.
District Court for the Western District of Washington, sitting by
designation.

\*\* This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

which was constructed by the Transmission Agency of Northern California with a group of public and private utilities, including Pacific Gas & Electric Company ("PG&E") and federal agencies.

PG&E entered Interconnection Agreements with the Districts, providing the terms under which the interconnected utility systems owned by the respective parties coordinated their operations. The complaint alleged that PG&E breached the notice and study provisions of these agreements.

The California Department of Water Resources entered into a State Water Contract with PG&E in 1982 to provide interconnection services of the Department's plants and facilities in PG&E's service area. The Department agreed to participate in the Remedial Action Scheme, which was an automatic protection system designed to detect abnormal or predetermined system conditions on a transmission grid and take corrective actions to maintain the reliability of the system. The State Water Contract expired on December 31, 2014, and in the Spring of 2014 the Districts raised concerns about the impact to their systems. When PG&E determined there was not a reasonable likelihood of any Adverse Impact to the service territories of the Districts, the Districts filed their complaint, which FERC denied.

The panel held that FERC misinterpreted the definition of Adverse Impact, and thus improperly disposed of the Districts' complaints without determining whether changes to the Remedial Action Scheme may result in reductions in transmission over the California-Oregon Transmission Project. The panel further held that FERC applied the wrong standard for initiating a study when making its factual findings.

On remand, the panel directed FERC to apply the broader definition of Adverse Impact that included reductions in import capability over the California-Oregon Transmission Project and the proper standard for requesting a study in determining whether PG&E breached the Interconnection Agreements.

## COUNSEL

Jon R. Stickman (argued) and Kenneth Holmboe, Duncan & Allen, Washington, D.C.; Sean M. Neal, Duncan Weinberg Genzer & Pembroke P.C., Sacramento, California; for Petitioners.

Carol J. Banta (argued), Ross R. Fulton and Susan Y. Chu, Attorneys; Robert H. Solomon, Solicitor; James P. Danly, General Counsel; Federal Energy Regulatory Commission, Washington, D.C.; for Respondent.

Alyssa Koo (argued), Pacific Gas and Electric Company, San Francisco, California, for Intervenor Pacific Gas and Electric Company.

Lisa S. Gast and Peter J. Scanlon, Duncan Weinberg Genzer & Pembroke P.C., Washington, D.C.; Michael R. Postar, Matthew R. Rudolphi, and Tyler E. Mansholt, Duncan Weinberg Genzer & Pembroke P.C., Washington, D.C.; Harvey L. Reiter, Stinson Leonard Street LLP, Washington, D.C.; for Intervenors Transmission Agency of Northern California; The M-S-R Public Power Agency; The City of Redding, California; and Sacramento Municipal Utility District.

Lisa G. Dowden and Katharine M. Mapes, Spiegel & McDiarmid LLP, Washington, D.C., for Intervenor California Department of Water Resources.

## **OPINION**

THOMAS, Chief Judge:

In this petition for review, we consider whether the Federal Energy Regulatory Commission ("FERC") acted arbitrarily and capriciously in denying a complaint brought by the Turlock and Modesto Irrigation Districts (collectively, the "Districts"). The complaint alleged that Pacific Gas & Electric Company ("PG&E") breached agreements between the Districts and PG&E. We conclude that FERC's orders denying the complaint and denying rehearing were arbitrary and capricious, and we grant the Districts' petition.

I

A

PG&E provides wholesale and retail electric service in northern and central California. PG&E owns an extensive electric transmission system within that area, which was turned over to the operational control of the California Independent System Operator ("Cal-ISO") in 1998. Cal-ISO provides transmission service over PG&E's system.

The Districts generate, transmit, and distribute electric power within their service areas. Each District retains operational control of its own transmission system. The Districts jointly own Westley Substation and three 230 kV transmission lines, the Westley-Parker, Westley-Walnut,

and Parker-Walnut lines. These lines move power from the Westley Substation to the Districts' service areas. Westley Junction is the point of interconnection between PG&E's system and each District's system. In addition, the Districts jointly own the Westley-Tracy Transmission Project, which interconnects with the Western Area Power Administration ("Western") system at Tracy Substation.

To supply power to their service areas, the Districts use transmission and generation facilities both within and outside of their individual electric systems. In order to import and export power into and out of their systems, the Districts use the California-Oregon Transmission Project ("California-Oregon Project"). The California-Oregon Project is a 500 kV line that extends approximately 340 miles from the Captain Jack Substation in southern Oregon to the Olinda Substation in northern California and then on to its terminus near PG&E's Tesla Substation in central California. The California-Oregon Project was constructed by the Transmission Agency of Northern California ("Transmission Agency") with a group of public and private utilities, including PG&E and federal agencies. Neither of the Districts has an ownership share in the California-Oregon Project. However, each District is a member of the Transmission Agency, and their interests in the California-Oregon Project arise through their membership in the Transmission Agency. This membership gives each District the right to use a share of the California-Oregon Project's transmission capacity. The California-Oregon Project provides the District with access to power generators in Oregon and Washington. The Districts rely on power imported from Oregon and Washington to reliably run their electric systems.

B

PG&E has entered into an Interconnection Agreement with Modesto and another with Turlock. The Interconnection Agreements provide the terms under which the interconnected utility systems owned by the respective parties coordinate their operations. The two agreements contain nearly identical terms, and we refer to them collectively.[1]

At issue in this case are the notice and study provisions in Section 9.11 of the Agreements. Section 9.11.1(a) requires a "Primary Party" to notify a "Coordinating Party" if the Primary Party intends to make a "Modification, New Facility Addition, or Long-Term Change to Operations" that "may reasonably result in an Adverse Impact to the System of the Coordinating Party." A "Primary Party" is a party that proposes to enact the Modification, New Facility Addition, or Long-Term Change to Operations; here, that party is PG&E. The "Coordinating Party" is the party whose System may be subject to an Adverse Impact from the change; here, those parties are the Districts.

A "Modification" is the "removal of, or physical change to, any element of either Party's then currently existing System"; this includes changes to any "electric transmission facility." A "Long-Term Change to Operations" is an action taken by a party that "materially alters, on a long-term basis, the configuration or other operational characteristics of its System." One action that may qualify as a Long-Term

---

[1] Following the practice of the parties, we capitalize terms that are defined in the Interconnection Agreements.

Change to Operations is "materially modifying a Remedial Action Scheme."[2]

An "Adverse Impact" is an effect on the Coordinating Party's "System" that either "materially degrades reliability" or "materially reduces" the ability of the Coordinating Party to "physically transfer power into, out of, or within" its System. A party's "System" consists of all properties and assets "which are leased to, licensed to, owned (or jointly-owned) by, or controlled" by that party.

If a Coordinating Party has a "reasonable belief" that a Primary Party did not provide the notice required by Section 9.11.1(a) and proceeded with a Modification, New Facility Addition, or Long-Term Change to Operations that "may result or may have resulted in an Adverse on the System of the Coordinating Party," then the Coordinating Party may demand that the Primary Party conduct a study pursuant to Section 9.11.1(b). Moreover, pursuant to Section 9.11.2, any party can request a joint study of any proposed Modification, New Facility Addition, or Long-Term Change to Operations of its System that "may reasonably be expected to result in an Adverse Impact."

C

The California Department of Water Resources ("the Department") entered into a contract with PG&E in 1982 (the "State Water Contract"). Under the State Water Contract, PG&E provided the Department with interconnection services of the Department's plants and facilities in PG&E's service area and firm physical electric

---

[2] No party contends that a "New Facility Addition" is at issue in this petition.

transmission service. In order to address the Department's needs to transmit large amounts of electric power, the Department agreed to participate in a Remedial Action Scheme.

A Remedial Action Scheme is an automatic protection system designed to detect abnormal or predetermined system conditions on a transmission grid and take corrective actions to maintain the reliability of the system. A Remedial Action Scheme typically consists of controllers or advanced microprocessor devices that monitor the system and that issue digital signals to initiate the operation of transmission devices. The Department's participation in the Remedial Action Scheme entailed interrupting the Department's pumping loads and generation. Its participation had the effect of increasing the transfer capability of the California-Oregon Intertie[3] to the benefit of all users.

Under its own terms, the State Water Contract would expire on December 31, 2014. Before the termination, the Department notified PG&E that it would not continue participating in the Remedial Action Scheme upon the expiration of the State Water Contract. Though the Department would stop participating, the physical Remedial Action Scheme infrastructure would remain in place. PG&E would not modify or remove any of the physical assets of the Remedial Action Scheme system when the State Water Contract terminated. PG&E would only re-program the

---

[3] The California-Oregon Intertie is the northern part of a three-line system that transfers electricity between the Pacific Northwest and central California. The California-Oregon Project is one of the three lines that is part of the California-Oregon Intertie.

controllers' logic so that system conditions would no longer initiate actions that cut off the Department's facilities.

In spring 2014, the Districts approached Cal-ISO and PG&E to raise concerns regarding the potential impact to their Systems from losing The Department's participation in the Remedial Action Scheme upon the termination of the State Water Contract. The subsequent discussions among the Districts and PG&E focused on two areas where the Districts were concerned that Adverse Impacts might occur: (1) in the service territories of each District (including the jointly-owned Westley substation and 230 kV transmission lines), and (2) at the California-Oregon Intertie, including the California-Oregon Project.

PG&E determined there was not a reasonable likelihood of any Adverse Impact to the service territories of the Districts due to the termination of the Department's participation in the Remedial Action Scheme. Based on the design of the Remedial Action Scheme, PG&E determined that the expiration of the State Water Contract would not impact the transmission lines that interconnected to the Districts' Systems. In addition, while there could be minimal impacts to the grid south of the Districts' Systems, PG&E determined that Cal-ISO would manage the grid through congestion management without affecting the Districts' Systems. PG&E concluded that losing the Department's participation in the Remedial Action Schemes was not likely to impact the reliability of either District's service territory or reduce either District's ability to physically transfer power into, out of, or within either its service territory.

Nonetheless, the Districts maintained concerns about the potential impact on the California-Oregon Project and, in turn, their ability to transfer power into their Systems.

PG&E responded that the California-Oregon Project was not a part of the Districts' Systems and therefore not covered by the Interconnection Agreements.  PG&E also noted that the majority owner of the California-Oregon Project, the Transmission Agency of Northern California (of which the Districts are members), was studying impacts to the California-Oregon Project.  PG&E felt it was unnecessary to perform additional studies with the Districts to assess the potential loss of The Department of Water Resources's participation in the Remedial Action Scheme on the California-Oregon Project.  PG&E refused to participate in the studies requested by the Districts.

D

In March 2015, the Districts filed a complaint against PG&E.  The Complaint argued that: (1) PG&E breached the notice requirement of Section 9.11.1(a) by failing to provide reasonable and timely notice of its actions; (2) PG&E breached the study requirements of Sections 9.11.1(b) and 9.11.2 by refusing to participate in the requested study; and (3) PG&E anticipatorily breached the mitigation and compensation requirements of Section 9.11.3 by refusing to mitigate any Adverse Impacts that the requested study might identify.

In July 2015, FERC issued the Complaint Order denying the Complaint.  *Modesto Irrigation Dist. and Turlock Irrigation Dist. v. Pac. Gas & Elec. Co.*, 152 FERC ¶ 61,016 (2015) ("Complaint Order").  FERC held that because the California-Oregon Project is not a facility within the Districts' Systems, any reductions on transfer capability caused by reprogramming of the Remedial Action Scheme would not qualify as Adverse Impacts on the Districts' Systems.  FERC also found that the record did not reflect any "likely" downstream Adverse Impacts on the Districts'

Systems from reprogramming of the Remedial Action Scheme.  FERC adopted findings of the Cal-ISO Transmission Planning Process studies and PG&E's own analyses that reprogramming of the Remedial Action Scheme "was not likely" to impact the Districts' Systems or their ability to transfer power into, out of, or within those Systems.  In August 2015, the Districts requested rehearing of FERC's Complaint Order.  In March 2016, FERC denied rehearing and affirmed its ruling from the Complaint Order. *Modesto Irrigation Dist. and Turlock Irrigation Dist. v. Pac. Gas & Elec. Co.*, 154 FERC ¶ 61,215 (2016) (the "Rehearing Order").  The Districts timely petitioned for review of FERC's two orders.

## II

We have jurisdiction over this petition pursuant to 16 U.S.C. § 825*l*.  We review FERC's orders determine whether its action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Fall River Rural Elec. Coop., Inc. v. FERC*, 543 F.3d 519, 525 (9th Cir. 2008).  "A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016).  Rather, the court must uphold a decision if the agency has "examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (alteration brackets omitted) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Our review "is limited to . . . the administrative record," *Envtl. Coal. of Ojai v. Brown*, 72 F.3d 1411, 1414 (9th Cir. 1995), and to those "grounds upon which . . . the record discloses that [the

agency's] action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

We generally review FERC's interpretations of contracts *de novo*, but we defer to FERC's interpretation when it relies on FERC's technical expertise. *See Pac. Gas & Elec. Co. v. FERC*, 746 F.2d 1383, 1387 (9th Cir. 1984) (holding that FERC's interpretation was entitled to deference because it was "clearly based upon the agency's expertise in electricity transmission regulation"); *cf. Texas Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 268–70 (1960) (affirming the *de novo* standard of review applied by the appellate court to an agency's interpretation of a non-technical contract clause); *Nicor Expl. Co. v. FERC*, 50 F.3d 1341, 1347 (5th Cir. 1995) (in natural gas context, noting that "we generally do not defer to the Commission's interpretation of gas supply contracts unless the Commission relied on its factual or technical expertise in reaching its conclusions.").

## III

FERC's orders were based on its interpretation of the term "Adverse Impact" in the Interconnection Agreements. FERC concluded that PG&E had not breached its obligations under the study requirements, because the California-Oregon Project was not part of the Districts' Systems and thus any transmission constraints on the Project would not be Adverse Impacts. This conclusion depended on FERC's overly narrow interpretation of an Adverse Impact., and we thus hold that FERC's orders were arbitrary and capricious.

## A

Section 4.2 of the Interconnection Agreements defines an Adverse Impact as:

> An effect on a Coordinating Party's System resulting from a Modification, New Facility Addition, or Long-Term Change to Operations to the Primary Party's System that: (1) materially degrades reliability of the Coordinating Party's System or (2) materially reduces the ability of the Coordinating Party's System to physically transfer power into, out of, or within said System as compared to the transmission system and generation facilities that are agreed by the Parties to be in service before implementation of the proposed Modification, New Facility Addition, or Long-Term Change to Operations . . . .

FERC never offers an explicit interpretation of this provision. However, we can discern FERC's interpretation from the conclusions in its orders and from its assertions at oral argument. As FERC interprets the provision, an Adverse Impact must be a direct, physical effect on a line or component inside a District's System. It cannot be a physical effect on a line or component *outside* of a District's System that makes it more difficult for a District to transfer power into its System. For example, a Long-Term Change to Operations that causes constraints on the California-Oregon Project and reduces the Districts' ability to transfer power over from the Pacific Northwest into their Systems would not be an Adverse Impact. This implicit interpretation can be found in FERC's Rehearing Order, where it states that it "found it dispositive that the California-Oregon Transmission Project was not part of the Districts' Systems." Rehearing Order at P 26. FERC concluded that the Districts had not shown that PG&E had breached the Interconnection Agreements "because the Districts failed to establish that an

Adverse Impact to their Systems might result in the first instance."  Rehearing Order at P 27.

This interpretation is grounded in a distinction between "reliability impacts" and reductions in import capability.  By "reliability impacts," FERC seems to mean the degradation of physical components of the Districts' own Systems.  By reductions in import capability (sometimes referred to as "operational" impacts), FERC seems to mean transmission constraints on the broader power grid that make it difficult for the Districts to access the power from where they want, when they want, within their contractual rights.[4]    For example, FERC's Rehearing Order states:

> Moreover, while there may be capacity reductions on the California-Oregon Transmission Project, the Districts' allocation of transmission capacity on that facility is governed by the Districts' membership in TANC and TANC's rights and obligations under the Operation Agreement.  Those rights are not considered

---

[4] As FERC notes, this distinction has appeared in prior orders.  *See Transmission Agency of N. Cal. v. Pac. Gas & Elec. Co.*, 148 FERC ¶ 61,150, 61,782 (2014) (distinguishing system reliability concerns from "concerns regarding a potential reduction in import capability that could follow the discontinuation of the . . . remedial action schemes"); *Transmission Agency of N. Cal. v. Pac. Gas & Elec. Co.*, 150 FERC ¶ 61,133, 61,948 (2015) ("While operational flexibility is related to reliability in a general sense, the concepts are not interchangeable.  We reemphasize that there is a difference between impacts to reliability and impacts to operational flexibility stemming from potential reductions in import capability." (footnotes omitted)).

part of the Districts' Systems as defined in the
Interconnection Agreements.

Rehearing Order at P 27.   FERC later stated that it
"recognize[s] the significance of import capability over [the
California-Oregon Transmission Project] and the associated
benefits of accessing economy capacity and energy and
coordinating actions; however, these operational aspects are
separate from reliability impacts."  Rehearing Order at P 34.
Under FERC's interpretation, only reliability impacts can
qualify as Adverse Impacts.

FERC's orders thus distinguished between impacts to the
internal reliability of the Districts' Systems and impacts to
the Districts' ability to import power into their Systems.
Under FERC's interpretation, only the former can qualify as
Adverse Impacts.

B

As noted above, we may defer to FERC's interpretation
of a contract when that interpretation reflects the agency's
expertise. *Pac. Gas & Elec. Co.*, 746 F.2d at 1387.  Here,
FERC's specialized knowledge of interconnected electrical
systems may very well have informed its understanding of
what qualifies as an "Adverse Impact" and, specifically, as a
"reliability impact."   But FERC forfeited any deference it
might otherwise have been owed by failing to demonstrate
how its interpretations reflect its expertise in this area, or are
typical of how those terms are used in the industry—or,
indeed, by failing to even explain clearly how it interprets
the terms at all.[5]  There in fact is a statutory definition of the

---

[5] Because, as we explain below, FERC's apparent understanding of
"reliability impacts" necessarily informs the understanding of the

term "reliable operation," Federal Power Act, 16 U.S.C. § 824*o*, that arguably supports FERC's understanding of "reliability impacts," but it was not mentioned in FERC's orders or in its briefs. *See Orr v. Plumb*, 884 F.3d 923, 932 (9th Cir. 2018) ("The usual rule is that arguments raised for the first time on appeal or omitted from the opening brief are deemed forfeited."). Because FERC's interpretations are therefore not "clearly based upon the agency's expertise in electricity transmission regulation," our review is de novo. *See Pac. Gas & Elec. Co.*, 746 F.2d at 1387.

Interpreting the contract de novo, we conclude that the contract's use of the term Adverse Impact can include reductions in import capability over the California-Oregon Project.

1

As relevant here, Section 4.2 defines an Adverse Impact as an effect on a District's System from a Long-Term Change to Operations that "(1) materially degrades reliability of the [District's] System *or* (2) materially reduces the ability of the [District's] System to physically transfer power into, out of, or within said System . . ." (emphasis added). The disjunctive "or" makes clear that reliability degradation is only one type of Adverse Impact. A reduction in the ability to transfer power into or out of a District's System is a second, and distinct, type of Adverse Impact. FERC and PG&E urge us to read the second prong as essentially a repetition of the first: that is, as only concerning degradation of the physical components of a District's

---

"ability to physically transfer" aspect of the definition of "Adverse Impact," the ambiguity in FERC's order infects its interpretation of the entire definition.

System.  However, the use of "or" makes clear that if reliability impacts involve degradation of physical components internal to the Districts' Systems (as FERC asserts), then reductions in transfer capability must involve something different.  We conclude that the plain meaning of Section 4.2 includes impacts outside of the Districts' Systems that reduce their ability to transfer power over the California-Oregon Project and into their Systems.  These "operational" effects, although they do not directly impact the physical components of the Districts' Systems, are effects on those Systems under Section 4.2, and they can constitute Adverse Impacts.

2

The interaction between Section 4.2 and Appendix B of the Interconnection Agreements bolsters this conclusion.  Section 4.2 of Modesto's Interconnection Agreement provides that "the Parties agree that the projects listed in Appendix B shall not result in an Adverse Impact on either Party's System."  Section 4.2 of Turlock's Interconnection Agreement provides that certain commitments made elsewhere "act to mitigate any Adverse Impacts caused by the projects listed in Appendix B," and thus that "Adverse Impacts caused by projects under construction and listed in Appendix B will not need to be further mitigated."  The clear implication of these provisions is that the projects listed in Appendix B are the kinds of projects that otherwise *could* cause Adverse Impacts.

Significantly, Appendix B includes the Panoche Energy Center ("Panoche").  The Districts submitted an affidavit from Larry Gilbertson, Assistant General Manager for the Turlock Irrigation District, who explained that the interconnection of Panoche to PG&E's System would *not* cause any overloads on the Districts' facilities within their

service areas.  Gilbertson Aff. at ¶¶ 30–31.  However, the interconnection of Panoche *could* have exacerbated loading on PG&E's System, which would in turn reduce the Districts' ability to transfer power into or out of their Systems.  *Id.*  PG&E agreed to preempt such Adverse Impacts by undertaking a project to rebuild one of its lines to prevent constraints on power transfer.  *Id.*

Thus, the parties included Panoche in Appendix B because it was the kind of project that could have caused an Adverse Impact, but which the parties agreed to exempt from notice and study requirements of the Interconnection Agreement.  That the parties believed that Panoche could cause an Adverse Impact even though it would have no physical effect on components of the Districts' Systems suggests that the definition of an Adverse Impact encompasses not merely physical effects within the Districts' Systems, but also effects outside the Districts' Systems that constrain their ability to transfer power into or out of their Systems.

3

Furthermore, FERC's definition of an Adverse Impact would render meaningless another provision of the Interconnection Agreements.  One of the events that can trigger an Adverse Impact is a "Long-Term Change to Operations."  The Interconnection Agreements provide a non-exhaustive list of "examples of actions and events that qualify as a Long-Term Change to Operations," the first of which is "disarming or materially modifying a Remedial Action Scheme."  Turlock Interconnection Agreement, § 4.24; *see also* Modesto Interconnection Agreement, § 4.23.  As FERC acknowledged in its Rehearing Order, the purpose of the Remedial Action Scheme is to support daily operating limits of north-to-south imports through the

California-Oregon Intertie, which includes the California-Oregon Project and two other PG&E lines.  Rehearing Order at P 2.  All of these lines are external to the Districts' Systems.

Under FERC's interpretation of Adverse Impact, overloads on the California-Oregon Project could never qualify as Adverse Impacts, even if they limited the ability of the districts to transfer power into or out of their Systems. Because the purpose of the Remedial Action Scheme is only to protect against such overloads, FERC's interpretation would render meaningless the inclusion of "modifying a Remedial Action Scheme" in the definition of Long-Term Change to Operations.  We will not interpret a contract so as to render one of its provisions meaningless.  *See, e.g.*, *Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 278–79 (9th Cir. 1992) (rejecting interpretation of contract that "violates a fundamental rule of contract interpretation because it would render other portions of the contract meaningless" (citing Cal. Civ. Code § 1641)).

4

The plain text of Section 4.2, in conjunction with other provisions of the Interconnection Agreements, make clear that FERC's interpretation of "Adverse Impact" is too narrow.  "Reliability" impacts may be limited to effects on the physical functioning of components internal to the Districts' Systems, but reliability impacts are only one side of the Adverse Impact coin.  Impacts to the California-Oregon Project that make it more difficult for the Districts to transfer power into their Systems from their resources in the Pacific Northwest can also constitute Adverse Impacts.

C

Adverse Impacts can include changes that risk overloading the California-Oregon Project and limiting the Districts' ability to transfer power into, out of, or within their Systems. FERC's orders denying the complaint and denying rehearing relied on a contrary interpretation. *See* Rehearing Order at P 26 (holding that it is "dispositive that the California-Oregon Transmission Project was not part of the Districts' Systems"). Because these orders misinterpreted the Interconnection Agreements that FERC was construing, they were arbitrary and capricious.

IV

In making factual findings, FERC applied the wrong standard for initiating a study under the Interconnection Agreements. Aside from their misinterpretation of Adverse Impact, the orders were thus arbitrary and capricious for this additional reason.

A

In a series of provisions, the Interconnection Agreements set low thresholds for requiring PG&E to provide notice of a study or for the Districts to demand a study in the absence of such notice. Section 9.11.1(a) provides that, if PG&E intends to make a Long-Term Change to Operations "that may reasonably result in an Adverse Impact" to a District's System, it must provide that District with written notice. Section 9.11.1(b) provides that if PG&E does not provide such notice, a District may demand a study if it has a "reasonable belief" that the Long-Term Change to Operations "may result or may have resulted in an Adverse Impact" on its System. Finally, Section 9.11.2 provides that, if requested by a District, PG&E must participate in a joint

study of any proposed changes "that may reasonably be expected to result in an Adverse Impact." This joint study requirement is meant to verify a party's belief that an Adverse Impact may occur as a result of a change. Section 9.11.2 further explains that a joint study will "determine the potential for, and magnitude of, such Adverse Impact and identify feasible avoidance or mitigation measures for the impact." Collectively, these provisions set low thresholds for the showing a District must make to demand a study or joint study. They plainly do not require a party requesting a study to show that an Adverse Impact is likely *before* the study has been conducted.

At certain points in its orders, FERC properly recited or paraphrased the language from the Interconnection Agreements setting out the low standard for demanding a study. *See* Complaint Order at PP 12, 25; Rehearing Order at n.7, PP 26, 36. However, when it made factual findings, FERC held the Districts to a higher standard. In finding that PG&E's actions did not constitute a breach of Section 9.11, FERC held that "while it is possible that transmission constraints on facilities outside the Districts' Systems could present reliability concerns and require mitigation measures . . . the record does not demonstrate that changes to the remedial action scheme discussed herein *will* have such a result." Rehearing Order at P 28 (emphasis added). FERC also stated that "'the record reflects no supporting evidence regarding the *likely* impact on [the Districts'] Systems' due to the remedial action scheme reprogramming." Rehearing Order at P 29 (emphasis added). FERC thus appears to have required the Districts to meet a higher threshold than that provided by the Interconnection Agreements (and recited earlier in its orders). Rather than requiring the Districts to show that they have a reasonable belief that ending the Remedial Action Scheme "may result" or "may reasonably

be expected to result in an Adverse Impact," FERC appeared to require that the Districts establish conclusively that an Adverse Impact was likely without the benefit of a study being conducted.

The Administrative Procedure Act requires that agencies engaged in "reasoned decisionmaking." *State Farm*, 463 U.S. at 52. The Supreme Court has held that it is a breach of the requirement of reasoned decisionmaking to "apply[] . . . a standard of proof which is in fact different from the . . . standard formally announced." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). By applying a different standard of proof than the one provided in the Interconnection Agreements and enunciated earlier in its orders, FERC breached the requirement of reasoned decisionmaking. Its orders were arbitrary and capricious.

B

FERC's arguments to the contrary are not persuasive. FERC first argues that we should defer to its interpretation of what is needed to show that a change "may result" in an Adverse Impact, because it applied its expertise in electricity regulation in determining the meaning of that phrase. However, as with its interpretation of an Adverse Impact, FERC did not explicitly rely on any technical expertise in interpreting the "may result" language. In the absence of evidence that FERC's interpretation was "clearly based" on its technical expertise, we do not defer to that interpretation. *See Pac. Gas & Elec. Co.*, 746 F.2d at 1387.

FERC then argues that while it did not recite the "may result" language throughout its orders, it did not purport to alter that evidentiary requirement. We cannot conclude, however, that FERC merely overstated its factual findings. We can only judge FERC's orders on the basis of the

administrative record before us, *Chenery*, 318 U.S. at 87, and that record does not show FERC assessing whether the Districts met the lower "may result" threshold.

Moreover, were we to take FERC at its word and conduct substantial-evidence review under the "may result" standard, we would still conclude that FERC's orders are arbitrary and capricious. Given the low threshold for demanding a study, the undisputed record indicates that Districts met their burden. The Districts established that they had a reasonable belief that PG&E's reprogramming of the Remedial Action Scheme would result in transmission constraints on the California-Oregon Project. Turlock affiant Gilbertson stated that if the reprogramming went unmitigated, it would "likely cause significant reductions in" transmission capacity and scheduling capacity in the California-Oregon Project. Gilbertson Aff. at ¶ 75. Modesto affiant Gregory Salyer stated that reprogramming would "provide a high likelihood of significant, decreased transfer capability" over the California-Oregon Project. Salyer Aff. at ¶ 26. In an affidavit submitted to FERC, PG&E even conceded that reprogramming the Remedial Action Scheme could cause constraints on the California-Oregon Project. Affiant Anupama Pandey stated that "the loss of [The Department of Water Resources's] participation in [the Remedial Action Scheme] will have a limited impact on the" California-Oregon Project, including a "curtailment" of the California-Oregon Project in certain instances. Pandey Aff. at ¶ 33.

FERC's own orders establish that the Districts met the low threshold for requesting a study. Immediately before concluding that there was no evidence that changes to the Remedial Action Scheme "will" or are "likely" to have an Adverse Impact, FERC stated that "it is possible that transmission constraints on facilities outside of the Districts'

Systems could present reliability concerns and require mitigation measures." Rehearing Order at P 28. This finding of a "possible" Adverse Impact alone would likely satisfy the low threshold for requesting a study under either Section 9.11.1(b) or Section 9.11.2. FERC also observed that "there may be capacity reductions on the California-Oregon Transmission Project" as a result of Remedial Action Scheme reprogramming, before dismissing such effects as outside the scope of an Adverse Impact.[6] Rehearing Order at P 27. This finding, too, would likely satisfy the low threshold for requesting a study.

## C

FERC applied the wrong standard for initiating a study under the Interconnection Agreements. Its orders rested on a conclusion that the Districts had not met a higher standard for initiating a study. Those orders were arbitrary and capricious.

## V

FERC misinterpreted the definition of Adverse Impact, and thus improperly disposed of the Districts' complaint without determining whether changes to the Remedial Action Scheme may result in reductions in transmission capacity over the California-Oregon Project. FERC also applied the wrong standard for initiating a study when making its factual findings. Thus, we grant the petition and remand to FERC for further proceedings. On remand, FERC should apply the broader definition of Adverse Impact that includes reductions in import capability over the California-

---

[6] As discussed *supra* section III.B, this conclusion was based on a misinterpretation of the definition of Adverse Impact.

Oregon Project and the proper standard for requesting a study in determining whether PG&E breached the Interconnection Agreements.

**PETITION GRANTED.**